**Robert B. ROGERS, Successor Executor for the Estate of Ewing M. Kauffman, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 97–2666–JWL.

United States District Court, D. Kansas.

June 10, 1999.

---

Kelley D. Sears, M. Kevin Underhill, Stanley P. Weiner, Susan A. Berson, Shook, Hardy & Bacon L.L.P., Kansas City, MO, Eric T. Mikkelson, Sylvan Sie-gler, Shook, Hardy & Bacon L.L.P., Kansas City, MO, for Robert B Rogers, Julia Irene Kauffman, plaintiffs.

Seth G Heald, Charles P Hurley, U.S. Department of Justice Office of Special Litigation–Tax Div., Washington, DC, for United States of America defendants.

### *MEMORANDUM AND ORDER*

LUNGSTRUM, District Judge.

This tax refund suit involves the Kansas City Royals Major League Baseball team, its former owner Ewing Marion Kauffman, now deceased, and former part-owner Avron B. Fogelman. At issue is the propriety of a $34 million bad debt deduction taken by the Royals on a purported loan to Mr. Fogelman and passed through to the tax return of Mr. and Mrs. Kauffman.

The matter is currently before the court on the parties' cross motions for full or partial summary judgment (Docs.68, 71). Also pending is the plaintiffs' motion to strike defense expert Paul McDaniel (Doc. 89). For the reasons set forth below, the plaintiffs' motion for partial summary judgment is denied, and the defendant's motion for summary judgment is granted. The motion to strike is now moot.

## I. Background [1]

In the late 1960s, Major League Baseball granted a franchise to the Kansas City Royals Baseball Corporation ("KCRBC" or "Royals"), an S corporation pursuant to I.R.C. § 1361.[2] KCRBC was wholly owned by Mr. Kauffman. Mr. Kauffman agreed in 1983 to sell Mr. Fogelman 49 percent of the Royals common stock for $10 million. For an additional $1 million, Mr. Kauffman also granted Mr. Fogelman an option to purchase the remaining 51 percent of KCRBC at some time in the future. The option exercise price was set at $10 million. In 1987, Mr. Kauffman

---

1. The following facts are uncontroverted or viewed in a light most favorable to the plaintiffs in accordance with the summary judgment standard applicable to the defendant's motion.

2. An S corporation's income and losses pass through to its shareholders and are taken into account in determining the shareholders' individual tax liability. *See* 11 Mertens Law of Fed Income Tax § 41B:01, at 13 (1998) (citing I.R.C. § 1366(a)).

sold Mr. Fogelman an additional 1 percent of the Royals stock, whereupon both men held 50 percent of the Royals stock, subject still to Mr. Fogelman's option to purchase the remainder of the stock for $10 million on some future date.

At some point in approximately 1987, Mr. Fogelman began to experience severe financial difficulties related to his real estate business. He owed his primary creditor, Citicorp Real Estate, Inc. in Atlanta, Georgia, over $800 million and owed more than $100 million to other lenders. Mr. Fogelman's financial condition continued to deteriorate in 1988 and 1989, and he began to explore avenues by which he might restructure his affairs. It became apparent that Mr. Fogelman's only unencumbered asset was his Royals stock and option. The only feasible way to fund a reorganization was somehow to obtain cash from his Royals interests.

Mr. Kauffman, the Royals, Mr. Fogelman, and Mr. Fogelman's creditors engaged in a series of sometimes contentious on-again, off-again discussions concerning the future ownership structure of the Royals and the extent to which and form in which Mr. Kauffman was willing to assist Mr. Fogelman's reorganization. Mr. Fogelman's option became a subject of concern in these dealings. There was disagreement about whether Mr. Fogelman

could exercise his option at his discretion, or whether the option was exercisable only upon the consent or death of Mr. Kauffman or after June 30, 2010.[3] Mr. Kauffman and Major League Baseball clearly did not want the option to be exercised with the potential result of having the Royals be owned by Mr. Fogelman's creditors. Eventually, the parties reached an agreement that has become the subject matter of this lawsuit.

The agreement, executed on July 31, 1990, included what the parties characterized as a $34 million loan from Mr. Kauffman to the Royals, and what they characterized as a corresponding $34 million loan by the Royals to Mr. Fogelman.[4] The Royals' purported loan to Mr. Fogelman was nonrecourse, secured by Mr. Fogelman's Royals stock and option.[5] The parties paid the State of Tennessee, Mr. Fogelman's state of residence, a $39,100 loan tax[6] from the proceeds of the alleged loan. The due date of Mr. Fogelman's nonrecourse note to the Royals was January 3, 1991, or earlier if the Royals were sold to a bidder at an auction process the parties had devised.

As a part of the transaction, Mr. Fogelman granted the Royals an option to purchase his stock and option for a price equal to the outstanding balance of his alleged Royals loan.[7] The Royals had the right to

3. On November 6, 1987, Mr. Fogelman sent Mr. Kauffman a letter in which Mr. Fogelman informally agreed not to exercise the option until Mr. Kauffman wished him to do so. On March 8, 1988, Mr. Fogelman agreed by letter that he would not exercise his option until after June 30, 2010 unless Mr. Kauffman asked him to. Mr. Fogelman also agreed, by letter, to give Mr. Kauffman his voting proxy in the event agreement could not be reached on any matter.

4. The defendant disputes in toto the plaintiffs' legal characterization of these transactions. Accordingly, the background information provided here describes the transactions the parties to the agreement purported to enter, and is not an indication that what the parties purported to do is a proper legal characterization of what they actually did. *Cf. Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.

16, 98 S.Ct. 1291, 55 L.Ed.2d 550 ("The general characterization of a transaction for tax purposes is a question of law .... The particular facts from which the characterization is to be made are not ...."); *Saviano v. Commissioner*, 765 F.2d 643, 645 (7th Cir.1985) ("[W]hile the parties are free to stipulate to the factual elements of the transactions, the court is not bound by the legal conclusions implied by the terminology utilized.").

5. A nonrecourse note is a note which the debtor has no personal liability to pay. The creditor's only recourse in the event of nonpayment is to foreclose on the collateral.

6. This tax amounts to .115 percent of the total value of the purported loan.

7. The unusual option exercise price does not appear to have been an oversight, and the

exercise the option at any time on or after the date it was granted, but the resultant securities transfer was not to occur until January 4, 1991, some five months after the reorganization agreement was signed and only one day after the due date on Mr. Fogelman's nonrecourse note. The Royals retained the right to decide not to close on the exercised option. As was apparently anticipated in the discussions leading up to the July 31, 1990 agreements, the Royals exercised the option immediately upon Mr. Fogelman's execution of the July 31, 1990 agreements.[8]

Also as part of the transaction, Mr. Fogelman agreed (1) to resign as a director and officer of the Royals and have no further management role in the Royals, (2) to waive all rights concerning Mr. Kauffman's exclusive right to manage the Royals, (3) to give Mr. Kauffman an irrevocable proxy to vote Mr. Fogelman's shares in the Royals, (4) to not enter Royals Stadium (now Kauffman Stadium) without the express permission of the Royals or Mr. Kauffman, and (5) to give up all of the owners perquisites he had previously enjoyed.[9] The parties agreed to modify Mr. Fogelman's option to purchase the Royals so that it could not be exercised before January 31, 1991 and would in any event terminate upon (1) foreclosure of the Royals' purported loan to Mr. Fogelman, (2) closing of the sale of Mr. Fogelman's Royals interest to the Royals pursuant to the Royals' option, or (3) the sale of the Royals at the planned auction. There was to be no cash distributed to either shareholder while the purported debt was outstanding. The parties also agreed that Mr. Fogelman had no obligation to meet capital calls, although he did retain and exercise the right to enjoy the tax benefits of any losses the Royals might pass through to him.

The parties hired the investment banking firm of Morgan Guarantee and Trust Company of New York ("Morgan") to conduct the planned auction of the Royals. The auction process was a part of the parties' agreement for a number of reasons, including protecting Mr. Kauffman from fraudulent conveyance claims in the event Mr. Fogelman's reorganization failed and assuring Mr. Fogelman's creditors that $34 million was adequate value for Mr. Fogelman's Royals interest. Conceptually, the parties designed the auction process so that the impact on Mr. Fogelman and his creditors would be the same as it would have been if Mr. Fogelman exercised his existing option to purchase the remainder of Mr. Kauffman's stock. Mr. Fogelman's creditors agreed to release claims to Mr. Fogelman's interest in the Royals provided they were placed in the same position as they would have been in if they obtained 100 percent of the Royals stock from Fogelman after he exercised his option for $10 million. One hundred percent of the Royals stock was up for auction, and the parties set a minimum price of approximately $80.86 million. The $80.86 million figure was sufficient to pay (1) all amounts the Royals owed to Mr. Kauffman, (2) all amounts that Mr. Kauff-

plaintiffs have not identified any evidence from which a rational jury could infer that it was an oversight. According to the express terms of the agreement and the terms of Mr. Kauffman's counsel's April 25, 1990 letter to Mr. Fogelman's counsel, the option exercise price decreased with every dollar Mr. Fogelman paid on the purported loan. Thus, had Mr. Fogelman repaid the "loan" in its entirety, the Royals apparently could have obtained Mr. Fogelman's interest for nothing.

8. The April 25, 1990 letter between Mr. Kauffman's and Mr. Fogelman's respective attorneys expressly indicates that the option was intended to be exercised immediately. More-

over, the Royals board of directors adopted a resolution on July 13, 1990 authorizing its officers to exercise the option and that "it is in the best interests of the Company and its stockholders to exercise the ... Option contemporaneously with the execution of the Stockholders Agreement [among Mr. Kauffman, Mr. Fogelman, and the Royals]."

9. The Royals Board of Directors had earlier (February 1, 1990) removed Mr. Fogelman from any positions with the Royals and withdrew many benefits, including expense accounts and an apartment, but at least some people at the bargaining table believed that the board action was subject to challenge.

man and Mr. Fogelman guaranteed for the Royals, (3) all of Morgan's fees, (4) Mr. Kauffman's attorneys fees, (5) all amounts guaranteed to certain Royals officers, and (6) the $10 million option exercise price on Mr. Fogelman's option to purchase the remainder of the Royals stock. Mr. Kauffman had the right to match any bid received at the auction. Mr. Fogelman agreed that neither he nor any related entities or persons would bid in the auction. The auction produced no acceptable bids and Morgan issued an opinion that the Royals equity was of nominal value.

Mr. Fogelman "defaulted" on his purported loan from the Royals on January 3, 1991, the nonrecourse note's due date. On that same day, Mr. Fogelman signed a waiver and consent in lieu of foreclosure in which Mr. Fogelman agreed to the Royals retaining his Royals stock and option. The parties also agreed that the fair market value of the collateral on January 3, 1991 was substantially below the face amount of the purported loan and that the Royals could not collect any deficiency from Mr. Fogelman because the note he signed was nonrecourse.

Asserting that the collateral it received on January 3, 1991 had no value, the Royals deducted the full amount of the alleged loan, plus interest, as a bad debt deduction pursuant to I.R.C. § 166 in 1991. The Royals, as an S corporation, passed the bad debt loss through to Mr. Kauffman, who utilized the loss on his 1991 joint tax return with Mrs. Kauffman. Defendant denied the bad debt deduction and assessed additional taxes against the Kauffmans' estates. The plaintiffs paid the amount of the assessment and properly filed administrative claims for a refund. The claims were denied, and the plaintiffs instituted this action.

## II. Analysis

### A. Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, depo-

sition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## B. Characterization

Both parties move for summary judgment on the issue of the proper legal characterization of the transactions at issue for tax purposes. The defendant claims that, notwithstanding the form of the transaction as a loan, the substance of the transaction was a sale or redemption of Mr. Fogelman's interest for $34 million. Therefore, the defendant claims, the plaintiffs' deduction for bad debt loss was improper. The plaintiffs, on the other hand, claim that the transaction meets all the requirements of a bona fide debt and therefore qualifies for a bad debt deduction. Viewing the facts in a light most favorable to the plaintiffs, the court concludes that summary judgment in favor of the defendant is appropriate because, on those facts, the defendant is entitled to judgment as a matter of law. *See Adler*, 144 F.3d at 670.

The defendant's argument for summary judgment is properly characterized as a substance over form argument. *See* David P. Hariton, *Sorting Out the Tangle of Economic Substance*, Tax Lawyer, Vol. 53, No. 2, at 235, 238–39 (recognizing important distinctions between substance over form doctrine and economic substance doctrine).

> In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed. The Court has never regarded the simple expedient of drawing up papers ... as controlling for tax purposes when the objective economic realities are to the contrary. In the field of taxation, administrators of

> the law and the courts are concerned with substance and realities, and formal written documents are not rigidly binding.... Nor is the parties' desire to achieve a particular tax result necessarily relevant.

> .      .      .      .      .

> The general characterization of a transaction for tax purposes is a question of law .... The particular facts from which the characterization is to be made are not ....

*Frank Lyon Co.*, 435 U.S. at 573, 581 n. 16, 98 S.Ct. 1291 (citations omitted); *see also Saviano*, 765 F.2d at 645 ("While the parties are free to stipulate to the factual elements of the transactions, the court is not bound by the legal conclusions implied by the terminology utilized."); *cf. Dolese v. United States*, 605 F.2d 1146, 1153 (10th Cir.1979) ("[W]hen there is no dispute in the evidence, it is a question of law whether the facts add up to debt or dividend."). Under this doctrine, a tax benefit is not available unless the objective economic realities of a transaction match the tax benefit Congress intended to provide. *See Bohrer v. Commissioner*, 945 F.2d 344, 347 (10th Cir.1991). The ability of a court to recharacterize a transaction, or look through the form of a transaction to examine its substance, is well recognized in tax litigation. *See C.F. Williams v. Commissioner*, 627 F.2d 1032, 1034 (10th Cir.1980) (affirming tax court recharacterization of cash disbursements by a close corporation to its shareholders from debt to constructive dividend, even where the form of the transactions nominally indicated the transactions were loans and there was evidence the shareholders subjectively intended to repay, where the only proper legal conclusion was that the disbursements were constructive dividends); *Dolese*, 605 F.2d at 1153 (affirming district court's grant of summary judgment recharacterizing cash disbursements by a close corporation to a shareholder from debt to constructive dividend even where the form of the disbursements indicated they were loans, interest was paid, some principal payments were

paid, and the shareholder had a bank balance strong enough to obtain a bank loan sufficient to pay off the entire loan).

■ The court concludes that the plaintiffs' attempt to characterize the transfer of $34 million to Mr. Fogelman as a debt is improper because the economic realities of the transaction, even granting the plaintiffs all the factual inferences to which they are entitled, overwhelmingly dictate the legal conclusion that a sale, or more properly, a redemption of Mr. Fogelman's Royals stock, and not a loan, took place. In reaching this conclusion, the court is ever mindful that this is a summary judgment proceeding and not a proceeding in which the court may weigh evidence and draw inferences against the plaintiffs. *See Adler,* 144 F.3d at 670. Rather, the court's conclusion is guided by the belief that any facts which remain in dispute are immaterial, *see id.,* and the keen recognition that it is the plaintiffs who bear the ultimate burden to prove their transaction amounted to a loan. *See Erickson v. Commissioner,* 937 F.2d 1548, 1551 (10th Cir. 1991) ("[T]he Commissioner's deficiency determination in a civil case is presumptively correct, and … the taxpayer bears the burden of coming forward with sufficient evidence to overcome the presumption."). Looking at all the evidence in a light most favorable to the plaintiffs, the court simply concludes that the economic realities of the transaction at issue do not match the tax benefit Congress intended to provide when it passed section 166.

The court has been unable to find, and the parties have not cited, any cases where a court has been asked to determine whether a transaction purportedly involving a nonrecourse loan was, in fact, a sale or redemption. The court thus begins with the language of the regulations interpreting section 166: "Only a bona fide debt qualifies for purposes of [a bad debt deduction pursuant to] section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." *See* 26 C.F.R. § 1.166–1(c).

The court believes there are only three factors which weigh in favor of the argument that the proper legal characterization of the transaction at issue is as a bona fide debt. They are not enough to provide a basis for a conclusion that the transaction was a loan. First, the parties clearly structured the form of the transaction to be a debt. The defendant does not dispute this. Although the court does not lightly disregard the form selected by the parties, it is not, of course, bound by it if the substance of the transaction was something different. *See Saviano,* 765 F.2d at 645; *Dolese,* 605 F.2d at 1153. Second, the parties paid a loan tax to the state of Tennessee. This tax, however, amounted to a paltry .115 percent of the total "loan" value and is not a material consideration. *Cf. Goldstein v. Commissioner,* 364 F.2d 734 (2d Cir.1966) (interest deduction disallowed for Irish sweepstakes winner even though she paid nearly 5 percent of her winnings to engineer a tax savings transaction). Finally, there is evidence that the transaction was nominally structured as a loan to satisfy Mr. Fogelman's intense, albeit unrealistic, hope that he might one day be able to regain his prior stature as a Royals owner. However, as discussed below, his alleged subjective desire not to part with the right to retain his Royals interest was absolutely and irrevocably rendered unattainable by the terms of the very deal to which he agreed.[10]

---

**10.** The plaintiffs argue strenuously that Mr. Fogelman's alleged desire to structure the transaction as a loan removes this case from the grips of the economic substance doctrine. *See James v. Commissioner,* 899 F.2d 905, 908 (10th Cir.1990) (transaction may be accorded tax recognition under economic substance doctrine if it has "economic substance which is … encouraged by business … realities.")

(citing *Frank Lyon Co.,* 435 U.S. at 583–84, 98 S.Ct. 1291). The plaintiffs' statement of the law on this point is absolutely correct, but the argument does not persuade the court that plaintiffs should avoid summary judgment for that reason. Whether Mr. Fogelman had a subjective desire to structure the transaction as a loan would be an issue of material fact if the question before the court were whether

The plaintiffs suggest that a nonrecourse loan is a bona fide debt any time the value of the collateral equals or exceeds the value of the loan because, if the debtor defaults, he or she will lose an asset worth as much or more than the debt. This is the point made in *Lebowitz v. Commissioner*, 917 F.2d 1314, 1318 (2d Cir. 1990) (citing *Crane v. Commissioner*, 331 U.S. 1, 14, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947)). *Lebowitz* went on to point out, however, that a nonrecourse loan transaction in which the collateral is worth less than the amount of the debt likely is *not* genuine because the taxpayer could "prudently abandon the property rather than pay off the obligation." *Lebowitz*, 917 F.2d at 1318 (citing *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1049 (9th Cir.1976)). The premise from which *Lebowitz* and other nonrecourse debt cases begin, then, is that the bona fides of a purported nonrecourse debt transaction depends in large part on the incentive the debtor has to repay.[11]

The parties here agree that the value of the collateral (Mr. Fogelman's Royals stock and option) at the date the transaction was entered into was equal to or greater than the value of the purported loan ($34 million), but the court nonetheless believes that the *Lebowitz* reasoning leads away from recognizing the transaction as a bona fide debt because the structure of the parties' transaction was such that there was no way Mr. Fogelman could have retained his stock as a matter of right by paying off the loan. Setting aside for

the transaction was a sham. There was, certainly, on the summary judgment record, a clear business purpose for the notion of putting money into Mr. Fogelman's hands to satisfy his creditors and protect the baseball franchise. This was not a transaction entered into for "the creation of income tax losses." *James*, 899 F.2d at 909. Moreover, there would have been a business purpose to provide that money through a loan rather than a sale if that were the only basis on which Mr. Fogelman would proceed. If a bona fide loan had been created, then, there would be no basis to disregard its form and treat the transaction as a sale just because Mr. Fogelman, in the end result, defaulted and KCRBC wound up with the stock. The court is forced to conclude, however, that the business purpose issue is not material here because, even though the need to placate Mr. Fogelman's creditors was a legitimate business reality for the Royals to cope with and assuming the transaction was structured in form as a loan at Mr. Fogelman's behest, the facts before the court add up to the legal conclusion that the transaction actually placed the money in Mr. Fogelman's hands through a redemption of Mr. Fogelman's stock, and not by a loan. *See Dolese*, 605 F.2d at 1153 ("[W]hen there is no dispute in the evidence, it is a question of law whether the facts add up to debt or dividend."). The parties cannot simply call a "sale" a "loan" and have that be determining for tax purposes. *See Saviano*, 765 F.2d at 645; *C.F. Williams*, 627 F.2d at 1034; *Dolese*, 605 F.2d at 1153; ; Hariton, Tax Lawyer, Vol. 53, No. 2, at 239 ("Standards must govern the factual characterization of relationships and arrangements to some extent, and

the Commissioner must have the ability to challenge the taxpayer's description of the relevant facts—otherwise the taxpayer's advantage would be insurmountable."). It matters not whether Mr. Fogelman realized what the actual substance of the transaction amounted to. What does matter is that the economic substance of the transaction entered into was divesting Mr. Fogelman of his interest in the Royals in return for $34 million—a sale, and not a loan.

11. Perhaps the unspoken but patently obvious corollary is that if the debtor repays the loan, the debtor has the *right* to receive his or her collateral "back"—just as a debtor who has personal liability, for example on a home loan secured by a mortgage or a car loan secured by a lien on the vehicle, can demand the creditor release the collateral upon payment in full. As discussed below, that basic element of a bona fide secured transaction is missing here because, under the arrangement entered into by the parties, even if Mr. Fogelman had paid the Royals in full, he could not have demanded his Royals interest back since as part and parcel of the deal he had granted an option to the Royals which, as contemplated from the outset, was immediately exercised by KCRBC. The Royals would still have held the cards upon repayment and would, under the curious terms of the option, have had to *then agree* to walk away from a free acquisition of Mr. Fogelman's interest. Such a transaction is hardly what a bona fide nonrecourse borrower would bargain for, but it is in substance what a seller would expect: parting with the *right* to own the property without anyone else's say so.

the moment the unlikeliness that Mr. Fogelman, an insolvent debtor, might have won the Irish sweepstakes or otherwise miraculously come up with $34 million in five months to repay his "loan" to the Royals, there was a large and specific economic *disincentive* for him to have done so. The Royals' option to purchase Mr. Fogelman's interest, which the parties contemplated would be exercised immediately upon closing of the "loan," had an exercise price of "an amount equal to the principal balance outstanding and all accrued, unpaid interest on the ... Loan on the ... Option Closing Date." Thus, under the terms of these agreements, any money Mr. Fogelman would have paid on the alleged loan would have *reduced* the amount he received from the Royals on the option closing date.[12] Not only did Mr. Fogelman have no economic incentive to pay the alleged loan, it would have been a financial disaster for him to have done so without first obtaining Mr. Kauffman's and the Royals' consent not to close on the option the Royals had exercised.[13] That is, the agreements upon which the claimed deduction is based would have had to have been modified before Mr. Fogelman had any economic incentive to pay back the "loan." Mr. Fogelman clearly could "prudently abandon the property rather than pay off the obligation."

Far from being a debtor-creditor transaction, the facts viewed in a light most favorable to the plaintiffs overwhelmingly dictate the legal conclusion that the transaction was a redemption of Mr. Fogelman's Royals stock and option. "A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent ...; it is a contract to pass rights of property for money—which the buyer pays or promises to pay to the seller." *Commissioner v. Brown,* 380 U.S. 563, 570–71, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965) (citations and internal quotation marks omitted); *see also Gurdin v. Commissioner,* 54 T.C.M. (CCH) 1609 (1988) ("For Federal income tax purposes, the term 'sale' is generally defined as a transfer of property for money or a promise to pay money.... In deciding whether a particular transaction constitutes a sale, the question of whether the benefits and burdens of ownership have passed from seller to buyer must be answered.") (citing *Brown,* 380 U.S. at 570–71, 85 S.Ct. 1162); *cf. J.B.N. Telephone Co., Inc. v. United States,* 638 F.2d 227, 231 (10th Cir.1981) ("In determining when a transfer of property is deemed to occur for tax purposes, this court has held that the passage of legal title is not controlling.... The test used is when the benefits and burdens of ownership passed.") (citations and internal quotation marks omitted) (timing of sale issue). In this case, in return for $34 million, Mr. Fogelman parted with all the burdens of ownership of his Royals interest on July 31, 1990. He parted with almost all of the benefits of ownership on July 31, 1990, retaining only two. He further agreed, on that same date, to a transaction that gave him absolutely no ability unilaterally to retain his remaining two benefits beyond January 4, 1991.

Mr. Fogelman was freed from any burdens associated with his Royals stock and option on July 31, 1990. First, he no longer had any obligation to make good on capital calls. The agreement specifically provided that "Kauffman hereby agrees that ... he will pay 100% of any and all Additional Capital Contributions." He also gave up any risk that the value of his Royals interest would fall below $34 mil-

---

**12.** Of course, the Royals retained the ability not to close on the option, but Mr. Fogelman had no control whatsoever over the Royals' decision.

**13.** Viewing the facts in a light most favorable to the plaintiffs, the court believes a rational jury could conclude that it would have been possible to obtain Mr. Kauffman's consent.

The point is immaterial, however. What is material is that Mr. Fogelman would have been subject to the unfettered discretion of Mr. Kauffman and KCRBC. *See Frank Lyon Co.,* 435 U.S. at 576, 98 S.Ct. 1291 ("A transaction must be given its effect in accord with what actually occurred and not in accord with what might have occurred.").

lion. Having already obtained $34 million in cash and not having any personal liability on his "debt," Mr. Fogelman simply bore no risk.

The July 31, 1990 agreements also separated Mr. Fogelman from all but two of the benefits associated with his Royals interest. First, any argument Mr. Fogelman may have had that he had the unilateral ability to exercise his option to purchase the remainder of the Royals stock from Mr. Kauffman ended on July 31, 1990.[14] As part of the July 31 agreements, Mr. Fogelman formally agreed not to exercise his option until at least January 31, 1991. Moreover, Mr. Fogelman's option was to terminate in any event on the earlier of (a) the date of closing at the contemplated auction sale (originally set for January 3, 1991), (b) the closing of the Royals' option to purchase Mr. Fogelman's interest (set for January 4, 1991), (c) the date on which Mr. Kauffman's interest in the common stock terminated (presumably, upon his death), (d) the date on which Mr. Kauffman obtained good and marketable title to all of the Royals stock (which actually occurred pursuant to Mr. Fogelman's waiver in lieu of foreclosure on January 3, 1991), or (e) the date of foreclosure on the Royals' purported loan to Mr. Fogelman (set for January 3, 1991). Even if Mr. Fogelman had acquired the funds to pay his "loan" back, he could do nothing unilaterally that would have allowed his option to exist beyond January 4, 1991, the date the Royals option to purchase his stock was set to close, and 27 days earlier than the earliest possible exercise date on his own option.

Second, Mr. Fogelman gave up any argument he may have had that he could vote his shares in the Royals. Mr. Fogelman had early-on given Mr. Kauffman a

proxy to vote his shares in the event the two could not agree. On July 31, 1990, Mr. Fogelman granted Mr. Kauffman his "irrevocable proxy to vote all shares of Common Stock owned by Fogelman." Third, Mr. Fogelman agreed that on the date the Royals exercised its option to purchase his interest (contemplated to be July 31, 1990), he would resign as an officer and director of the Royals and have no role at all in the management of the Royals.[15] He further agreed not to seek election as a director, and that Mr. Kauffman had the exclusive right to nominate and elect all members of the board. Fourth, Mr. Fogelman agreed not to challenge the removal of all of his perquisites as a Royals owner. Specifically, he agreed that "he shall never object to or in any way challenge the contemporaneous or previous termination of any and all privileges and perquisites that he may have enjoyed ... resulting from his ownership interest in the Company." These perquisites included (1) a company car, (2) a company apartment, (3) a company expense account, (4) a company credit card, (5) a suite at Royals Stadium and catering, (6) travel expenses to professional baseball meetings, (7) free Royals marketing merchandise, (8) front office administrative assistance, (9) use of the Stadium Club at Royals Stadium, (10) tickets to games and parking, and (11) the right even to enter Royals Stadium. Fifth, Mr. Fogelman gave up any right to receive any distribution of cash from the Royals "so long as the ... loan is outstanding." Of course, Mr. Fogelman had no right to direct a cash-out transaction in any event, and Mr. Fogelman had no way to stop the Royals from obtaining his Royals interest for free had he attempted to repay the "loan." Sixth, Mr. Fogelman gave up any right to bid for the Royals at the auction the parties had devised, a ben-

14. Mr. Fogelman had earlier agreed by informal letter to exercise only upon Mr. Kauffman's consent, but it is uncontroverted that at least some people at the respective bargaining tables were concerned that it could be exercised immediately. *See supra* n. 3.

15. The plaintiffs contend that the Royals board had already taken this action in February, 1990, but it is uncontroverted that some of the parties involved believed the board action was subject to challenge. Mr. Fogelman lost any right to challenge on July 31, 1990.

efit Mr. Kauffman specifically reserved for himself.

For five months, Mr. Fogelman retained two benefits of ownership in his Royals interest, but the agreements he signed on July 31, 1990 were such that he had no way unilaterally to retain those benefits after January 4, 1991. First, Mr. Fogelman retained on July 31 the right to deduct Royals operating losses. The Royals actually allocated 50 percent of its losses to Mr. Fogelman between July 31, 1990 and January 3, 1991. Mr. Fogelman actually deducted those losses on his tax returns for the relevant years. Second, the auction process specifically contemplated that, in the event the team sold at auction, Mr. Fogelman and his creditors would obtain the excess funds over the reserve price according to a complex formula the parties had established. He had no power to retain these benefits beyond January 4, 1991, however, because the Royals' option to purchase his stock was set to close on that date.[16]

In sum, the court concludes that the evidence in this case viewed in a light most favorable to the plaintiff adds up to the legal conclusion that the transaction was a redemption of Mr. Fogelman's stock and not a bona fide debt. The transaction gave Mr. Fogelman no incentive or obligation to repay his purported debt in "money," see 26 C.F.R. § 1.166–1(c), and he parted with all of the burdens, and all but two of the benefits of his Royals interest on the date the "loan" closed. Moreover, he had no way to continue to retain even those two benefits beyond January 4, 1991 and had absolutely no *right* to retain

his Royals interest simply by paying off his purported debt in light of the option he granted to KCRBC as an integral part of the transaction. This is the stuff of substance. Legally, it overwhelms the nominal form of the transaction, in which the parties paid a minimal loan tax and, presumably, attorneys fees to negotiate and draft documents. Moreover, it legally overwhelms any evanescent desire Mr. Fogelman may have had to perpetuate his dream of Royals ownership by having the transaction structured as a loan. Mr. Fogelman agreed on July 31, 1990 to a transaction that gave him no right to retain any ownership in the Royals even if he paid off his "loan." Whatever Mr. Fogelman's desires may have been, what he agreed to was in substance a redemption—not a loan. The court grants summary judgment in favor of the defendant on this issue.

### D. Section 162(a)

The plaintiffs claim, in the alternative, that the Royals are entitled to deduct the $34 million payment from the Royals to Mr. Fogelman as an ordinary and necessary business expense pursuant to I.R.C. § 162(a). The defendant moves for summary judgment, which the court grants.

Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business." In contrast, I.R.C. § 263 allows no deduction for a capital expenditure—an amount paid out for new or for permanent improvements or betterments made to increase the value of

---

**16.** Retention of the benefits between the date the transaction was entered into and the date Mr. Fogelman signed the waiver and consent in lieu of foreclosure on January 3, 1991 is not at all inconsistent with a sale. Between the date a contract is entered into and the date it is closed it is not uncommon for the seller to retain certain benefits of ownership, as one selling his or her home typically occupies it "rent free" between the contract signing and the deed transfer. What may be viewed as atypical is that Mr. Fogelman received the money in 1990 and the option to

KCRBC was not set to close until 1991. However, given the Royals' overarching business purpose to ward off Mr. Fogelman's creditors an immediate provision of cash to him was necessary and with the tightly drawn terms of the deal any risk to the Royals of a delay into 1991 to culminate the transaction was minimal. Mr. Fogelman was no longer in a position to devalue the collateral because, unlike the proverbial homeowner referenced above, he was *not* "in possession" and only enjoyed certain passive benefits during the interim.

any property or estate. "Stock redemptions, as a general rule, are characterized as capital transactions, and the purchase price of a stock redemption is not deductible." *United States v. Houston Pipeline Co.*, 37 F.3d 224, 226 (5th Cir.1994).

Plaintiffs contend their case falls within an exception to the general rule that stock redemptions are not deductible. *See Five Star Mfg. Co. v. Commissioner*, 355 F.2d 724 (5th Cir.1966) (purchase at a judicial sale of the stock of a 50 percent shareholder in a corporation by the only other shareholder was an ordinary and necessary business expense because the purpose behind the purchase of the stock was to save the company from liquidation). The Royals payment of $34 million to Mr. Fogelman falls within the exception, they claim, because the Royals risked losing its baseball franchise if it did not buy out Mr. Fogelman. The American League did not allow baseball teams to be owned by creditors, and there was a risk the creditors would front $10 million, require Mr. Fogelman to exercise his option, and sell the team to the highest bidder.

The court rejects the plaintiffs' claims. No reported decision in the 33 year history of *Five Star* has followed its holding. The Fifth Circuit itself has severely limited *Five Star*:

> [Our] cases stressed the extraordinary factual circumstances that warranted the *Five Star* holding.... [T]he *Five Star* rule applies only to situations where the expenditure is "made to save the corporation from dire and threatening circumstances."

> .     .     .     .     .

> From [the facts of the *Five Star* case] comes the *Five Star* exception: where the redemption is absolutely necessary to the survival of the company, a deduction may be allowed. In this case, the plaintiff had the option to redeem the shares or allow [a hostile takeover]. It was the plaintiff's choice to pay $124.53 million to redeem the shares .... The redemption was not necessary to the corporation's survival as a going concern, and *Five Star* does not provide the plaintiff with a legal basis for its claimed deduction.

*Houston Pipeline Co.*, 37 F.3d at 229–230 (affirming grant of summary judgment to government). The tax court has gone even further, and explicitly rejected *Five Star*:

> To the extent that the Fifth Circuit's *Five Star* exception apparently transmutes the purchase price and expenses of a corporation's acquiring its own stock into ordinary and necessary expenses deductible under section 162, we think it has been sapped of any remaining vitality by the Supreme Court's *Woodward* [*v. Commissioner*, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970)], [*United States v.*] *Hilton Hotels* [*Corp.*, 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970)], and *Arkansas Best* [*Corp. v. Commissioner*, 485 U.S. 212, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988)] line of cases. Accordingly, we respectfully decline to follow the Fifth Circuit's *Five Star* opinion in this case, and we hold to our ... rationale that redemption of stock is a nondeductible capital transaction. The reasons behind the redemption cannot transform the transaction into one of a capital nature.

*Frederick Weisman Co. v. Commissioner*, 97 T.C. 563, 573, 1991 WL 241153 (1991).

█ The court believes the Tenth Circuit would, at least under the circumstances here, decline to follow *Five Star*. Accordingly, the court follows the general rule that stock redemptions are not deductible under section 162(a). Summary judgment on this issue is granted in favor of the defendant.

## E. Case Status

The court does not endeavor to discern what issues, if any, may remain in the case. The court notes, however, that its holdings today preclude the plaintiffs' claims that, if the transaction was a redemption of Mr. Fogelman's Royals interest, the Royals are entitled to a bad debt

deduction for the excess of $34 million over the value of Mr. Fogelman's interest. The court's conclusion on summary judgment is that the transaction did not involve any debt. The court's holdings similarly preclude the plaintiff's allegations that, if the transaction was a redemption of Mr. Fogelman's Royals interest, the Royals are entitled to an ordinary and necessary expense deduction for the excess of $34 million over the value of Mr. Fogelman's interest. The court's conclusion on summary judgment is that any such expense is a capital expense.

Nor do any issues from the plaintiffs' motion for partial summary judgment remain. The plaintiffs' motion was almost exclusively geared toward establishing the bona fides of the purported debt transaction. The plaintiffs also sought summary judgment, however, on the issue of whether Mr. Kauffman's transfer of $34 million to the Royals was a loan or a contribution to capital. Under the court's reading of the final pretrial order, this issue is moot because the defendant only intended to assert that the transfer was a contribution to capital if the Royals' transaction with Mr. Fogelman was held to be a loan. The plaintiffs' motion for partial summary judgment is denied in its entirety.

The plaintiffs' motion to strike the expert testimony of Professor Paul McDaniel is moot. A review of Mr. McDaniels' Rule 26(a)(2) report reveals that the court has resolved on summary judgment all of the issues upon which he was proffered to testify.

The parties shall have until 5:00 p.m. on June 17, 1999 to notify the court in writing whether they believe any matters identified in the final pretrial order remain at issue.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the defendant's motion for summary judgment (Doc. 71) is granted.

**IT IS FURTHER ORDERED THAT** the plaintiffs' motion for summary judgment (Doc. 68) is denied.

**IT IS FURTHER ORDERED THAT** the plaintiffs' motion to strike expert Paul McDaniel (Doc. 89) is moot.

**IT IS FURTHER ORDERED THAT** the parties shall have until 5:00 p.m. on June 17, 1999 to notify the court in writing whether they believe any matters identified in the final pretrial order remain at issue.

**IT IS SO ORDERED.**