**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 22 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROBERT B. ROGERS, Successor
Executor for the estate of Ewing M.
Kauffman, and JULIA IRENE
KAUFFMAN, Executrix for the Estate
of Muriel I. Kauffman,

      Plaintiffs-Appellants,

    v.

UNITED STATES OF AMERICA,

      Defendant-Appellee.

Nos. 00-3013, 00-3030

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 97-CV-2666-JWL)**

---

Kelley D. Sears (Stanley P. Weiner, Sylvan Siegler and Susan A. Berson, with
him on the briefs), Shook, Hardy & Bacon L.L.P., Kansas City, Missouri, for
Plaintiffs-Appellants.

Kenneth W. Rosenberg, Attorney, Tax Division, (Eileen J. O'Connor, Assistant
Attorney General, James E. Flory, United States Attorney, and Richard Farber,
Attorney, Tax Division, with him on the briefs), United States Department of
Justice, Washington, D.C., for Defendant-Appellee.

---

Before **BRORBY** , **HOLLOWAY** , and **HENRY** , Circuit Judges.

**HENRY** , Circuit Judge.

———————————————

Plaintiffs-Appellants Robert B. Rogers and Julia I. Kauffman ("the taxpayers") brought this tax refund suit appealing the denial by the Internal Revenue Service of a bad debt deduction. The district court granted summary judgment in favor of the United States on the issue of the characterization of the transaction forming the basis for the requested bad debt deduction. See Rogers v. United States , 58 F. Supp. 2d 1235 (D. Kan. 1999) (" Rogers I "). The taxpayers now appeal that ruling. The taxpayers also appeal the portion of a subsequent summary judgment ruling in which the district court denied them a partial refund for overpaid taxes under the doctrine of equitable recoupment. See Rogers v. United States , 76 F. Supp. 2d 1159 (D. Kan. 1999) (" Rogers II "). Finally, the taxpayers appeal the district court's denial of their motion to strike the reports and testimony of one of the government's expert witnesses. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the summary judgment orders of the district court and decline to address the expert witness issue.

# I. BACKGROUND

Because the facts of this case were set forth at length in the district court's opinion, see Rogers I, 58 F. Supp. 2d at 1236-39, we will repeat them here in less detail. This case arises from a series of transactions between Ewing M. Kauffman, the deceased former owner of the Kansas City Royals Major League Baseball franchise (the "Royals"), and Avron B. Fogelman, a former part owner of the Royals. In 1983, Mr. Kauffman was the sole owner of the Royals, which was organized as an S corporation pursuant to Internal Revenue Code ("I.R.C.") § 1361. At that time, Mr. Kauffman sold a 49 percent interest in the team to Mr. Fogelman for $10 million. For an additional $1 million, Mr. Kauffman also sold Mr. Fogelman an option to purchase Mr. Kauffman's remaining 51 percent interest in the team. The option exercise price was $10 million. In 1987, Mr. Kauffman also sold Mr. Fogelman an additional 1 percent of the team—leaving each with a 50 percent interest—without disturbing Mr. Fogelman's option.

Beginning in 1987, Mr. Fogelman experienced severe financial difficulties in his real estate business which resulted in him owing almost $1 billion to his creditors. His only unencumbered asset was his interest in the Royals. He began negotiating with the team in order that he might use that interest to obtain cash to fund a reorganization of his other business interests. After protracted and contentious negotiations—which also involved Major League Baseball and Mr.

Fogelman's creditors—the parties reached an agreement on July 31, 1990.

Under this agreement, as characterized by the parties involved in the transaction, Mr. Kauffman lent $34 million to the Royals, which in turn lent $34 million to Mr. Fogelman. This nonrecourse loan was secured by Mr. Fogelman's ownership interest in the Royals and his option to purchase the rest of the team. Mr. Fogelman's nonrecourse note to the team was due on January 3, 1991, unless the team was sold before that date at an auction the parties agreed to hold. In addition, Mr. Fogelman granted the Royals an option (the "KCRBC Option") to purchase both his share of the team and his option to buy Mr. Kauffman's share.

The Royals "exercised" this option contemporaneously with the execution of the agreement on July 31, 1990 but deferred the "closing" of the option until January 4, 1991. Under the terms of this option, the purchase price for Mr. Fogelman's interest would be "an amount equal to the principal balance outstanding and all accrued, unpaid interest on the KCRBC Loan on the KCRBC Option Closing Date." [1] Aplts' App. vol. IV, at 555 (Article VII of July 31, 1990 Kansas City Royals "Stockholders [sic] Agreement," setting forth terms of the KCRBC Option). The parties dispute, however, what would have occurred with

---

[1] In order to transfer "good and marketable title" to the Royals as required by the Stockholders Agreement, however, Mr. Fogelman would presumably be required immediately to retire the loan by repaying the outstanding balance. Aplts' App. vol. IV, at 555.

this option in the event that Mr. Fogelman had repaid the full amount of the loan.

The auction process, conducted by J.P. Morgan & Co., was held in the fall of 1990. As the interests of both Mr. Kauffman and Mr. Fogelman were for sale, the entire team was available for a minimum bid price of approximately $80 million. Although several parties initially expressed interest, there were no bidders, and J.P. Morgan subsequently issued an opinion asserting that Mr. Fogelman's 50% interest in the team was of only "nominal" value. See Aplts' App. vol. III, at 309.

On January 3, 1991, the repayment date of the nonrecourse note, Mr. Fogelman signed an agreement in which he transferred his Royals interest to the team in lieu of its foreclosure on the note. Although this was only six months after the Royals had "loaned" $34 million secured by this stock without recourse (i.e., made a loan assuming the stock had at least $34 million in value), the Royals claimed this collateral as being without value based on J.P. Morgan's assessment and subsequently deducted the full amount of the note, plus interest, as a bad debt pursuant to I.R.C. § 166. Because of the Royals' S Corporation status, this loss was passed through to Mr. Kauffman, who deducted it from his 1991 joint individual tax return. The Internal Revenue Service later denied the deduction and assessed additional taxes because it determined that the transaction claimed as the basis of the bad debt question was in substance a redemption of Mr.

Fogelman's Royals stock and not a loan. After paying that assessment and mounting an unsuccessful administrative challenge, the taxpayers brought this action.

Before trial, both sides moved for summary judgment on the issue of whether the transaction was properly characterized as a loan or as a sale. In response to these motions, the district court ruled that the government's position in the suit was "properly characterized as a substance over form argument." Rogers I, 58 F. Supp. 2d at 1240. The court cited a number of cases in support of the proposition that "[i]n applying this doctrine of substance over form, the [Supreme] Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed." Id. (quoting Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978)) (citations omitted).

The district court further concluded that

the plaintiffs' attempt to characterize the transfer of $34 million to Mr. Fogelman as a debt is improper because the economic realities of the transaction, *even granting the plaintiffs all the factual inferences to which they are entitled*, overwhelmingly dictate the legal conclusion that *a sale, or more properly, a redemption of Mr. Fogelman's Royals stock, and not a loan, took place.*

Id. at 1241 (emphasis added). After reviewing the facts of the case and deciding that there were no material issues remaining, the court granted summary judgment in favor of the United States on the issue of the characterization of the transaction.

-6-

In response to this ruling, the taxpayers filed a summary judgment motion to recover a refund for various tax payments they had incurred on the basis of treating the transaction as a loan and not a redemption. Since any refund of these payments was barred by the statute of limitations, the taxpayers requested that the court apply the doctrine of equitable recoupment. The district court ruled partially in favor of the taxpayers and partially in favor of the government on this motion. See Rogers II , 76 F. Supp. 2d at 1173.

Finally, the taxpayers filed a motion during the course of the litigation to strike the reports of and preclude testimony from four of the government's expert witnesses. The district court denied the taxpayers' motion with respect to three of the four designated experts, including Mr. Andrew Zimbalist.

The taxpayers now appeal the district court's grant of summary judgment in favor of the government with respect to the characterization of the transaction as a sale. The taxpayers also appeal the portion of the district court's grant of summary judgment in favor of the government relating to the refund requested under the doctrine of equitable recoupment and the district court's ruling with respect to the expert testimony of Mr. Zimbalist. We now affirm the district court's summary judgment orders and decline to address the issue of Mr. Zimbalist's expert testimony.

## II. DISCUSSION

### A. Characterization of the Transaction on Summary Judgment

#### 1. Standard of Review

We review the district court's grant of summary judgment *de novo*, "applying the same legal standard as the district court" under Fed. R. Civ. P. 56(c). David v. City & County of Denver, 101 F.3d 1344, 1355 (10th Cir. 1996). We must resolve factual disputes and draw inferences in favor of the taxpayers, who are the nonmoving party. "Summary judgment is warranted only if the uncontroverted material facts establish that the moving party is entitled to judgment as a matter of law." Id.

#### 2. The Applicable Legal Standard

On appeal, the taxpayers emphatically assert that the district court applied an incorrect legal standard in granting summary judgment. They argue for the application of a tax shelter doctrine called the substantive sham—or economic substance—doctrine. [2] Although the government originally sought summary

---

[2] The terms used in dealing with tax-avoidance cases are often confusing. As one court has noted, "'economic shams'—that is, transactions which actually occurred but which exploit a feature of the tax code without any attendant economic risk . . . [—stand opposed to] 'factual shams'—transactions which either did not occur, did not occur as reported or were performed in violation of some of the background assumptions of commercial dealing . . ." Horn v.

(continued...)

-8-

judgment under the economic substance doctrine, [3] the taxpayers state that the district court incorrectly concluded that the government's argument was properly characterized as a substance over form argument when the court decided that "the substantive sham and substance over form doctrines constituted separate and distinct doctrines." Aplts' Br. at 30-31. The taxpayers characterize this as "mistaken." Id. at 31. "No distinction," they contend, "exists between the substantive sham and substance over form doctrines. As a matter of law, they are the same." Id. at 32.

In support of this proposition, the taxpayers cite Bohrer v. Commissioner, 945 F.2d 344 (10th Cir. 1991). In Bohrer, this court stated that in Gregory v. Helvering, 293 U.S. 465 (1934), the Supreme Court "focused on substance over form and held that the 'transaction upon its face lies outside the plain intent of the statute' and would not generate the desired tax benefits. The disallowance of sham transactions has since been applied in a variety of contexts." Bohrer, 945 F.2d at 347 (quoting Gregory, 293 U.S. at 470) (citation omitted). The taxpayers

_____

[2](...continued)
Commissioner, 968 F.2d 1229, 1236 n.8 (D.C. Cir. 1992). In order to avoid confusing economic/substantive shams with factual shams, we note at the outset that we choose to employ the term "economic substance doctrine" in place of the term used most often by the taxpayers in this case (i.e., "substantive sham doctrine").

[3] Because of this fact, the government bears part of the blame for the confusion surrounding this case.

argue that Bohrer thus recognized no distinction between the economic substance and substance over form doctrines.

Under either of these doctrines, they propose, a court "may not inquire into the substance of a transaction" unless it first determines "that the transaction was a sham, that is, not bona fide." Aplts' Br. at 33. In essence, they argue that only a tax-avoiding transaction lacking any business purpose may be recharacterized by the government for tax purposes. The taxpayers state that a transaction which "has practical economic effects other than tax avoidance [] must be upheld if (1) it 'has a business purpose or economic substance which is compelled or encouraged by business or regulatory realities and is imbued with tax independent considerations and is not shaped by tax avoidance features that have meaningless labels attached,' or (2) it objectively affects the taxpayer's net economic position." Id. at 36 (quoting James v. Commissioner, 899 F.2d 905, 908 (10th Cir. 1990)). The taxpayers also contend that there is no difference between business purpose and economic substance. As the transaction that is challenged in this case "resulted in the parties having a different set of legal relationships than before the loan," the taxpayers conclude that the cited cases require the transaction to be deemed a loan. Id. at 37. "No other court," they boldly assert, "has rewritten or allowed the government to disregard a transaction unless it was designed to manipulated [sic] the tax code to create tax deductions." Id. at 31

-10-

(citing Northern Indiana Pub. Serv. Co. v. Commissioner, 115 F.3d 506, 512 (7th Cir. 1997)). Put another way, their argument is that if a transaction has economic substance or a business purpose of any kind, its taxpayer-designated form may not be recharacterized.

In response, the government states that "[i]f the sole purpose of a transaction is to create tax deductions, that is sufficient reason to disregard it for tax purposes." But, the government continues,

> the absence of such a purpose does not establish, as taxpayers would have it, that the form of the transaction has economic substance and therefore must be respected for tax purposes. The doctrine of substance over form is a fundamental principle of the tax laws that has application whenever tax consequences turn on the true nature of a transaction.

Aple's Br. at 31. In support, the government cites several cases, including United States v. Phellis, 257 U.S. 157, 166 (1921); Riley v. Commissioner, 649 F.2d 768, 773 (10th Cir. 1981); and Hamlin's Trust v. Commissioner, 209 F.2d 761, 764 (10th Cir. 1954).

The government also distinguishes several cases cited by the taxpayers. For example, the government contends that the Northern Indiana decision was "a far cry from holding, as taxpayer contends, that the substance-over-form doctrine applies only where the transaction is first held to be a sham"; instead, the government claims that case only held that "'a [foreign subsidiary] corporation and the form of its transactions are recognizable for tax purposes, despite any tax-

-11-

avoidance motive, so long as the corporation engages in bona fide economically-based business transactions.'" Aple's Br. at 36 (quoting Northern Indiana, 115 F.3d at 512). The government states that the "[t]axpayers' attempt to bootstrap limitations on the sham transaction doctrine into limitations on the substance-over-form doctrine simply is misconceived." Id.

It is evident that the distinctions among the judicial standards which may be used in ex post facto challenges to particular tax results—such as the substance over form, substantive sham/economic substance, and business purpose doctrines—are not vast. Indeed, one academic commentator has described them as "fairly gossamer." See Martin J. McMahon, Jr., Random Thoughts on Applying Judicial Doctrines to Interpret the Internal Revenue Code, 54 SMU L. Rev. 195, 195 (2001). Another article characterizes these doctrines as "closely related" to one another. See Joseph Bankman, The Economic Substance Doctrine, 74 S. Cal. L. Rev. 5, 12 (2000). Nevertheless, for several reasons, we cannot agree with the taxpayers' assertion that there is *no* difference among these doctrines.

First, the bulk of the academic literature on the subject indicates that there are meaningful differences in the practical applications of the doctrines. For example, one commentator states:

> The major purpose of the substance-over-form doctrine is to recharacterize transactions in accordance with their true nature. The

economic substance doctrine, . . . in contrast, seeks to deny tax benefits on the ground that the non-tax basis for the transaction is insufficient to warrant application of those benefits.

John P. Warner, Statutory, Regulatory, and Common Law Anti-Abuse Weapons, 485 PLI/Tax 883, 889 (2000). Supporting this distinction, another author argues that in considering challenges to "real world transactions" (i.e., transactions that are not economic shams), a tax analysis

> attempts to divine the substance of the transaction to determine whether the form adopted properly reflects the substance. If so, the consequences expected to result from the form will in fact obtain. If not, the transaction may be recast with tax consequences appropriate to the substance and not the form. As noted, the re-characterization can benefit the government or taxpayers.

Peter C. Canellos, A Tax Practitioner's Perspective on Substance, Form and Business Purpose in Structuring Business Transactions and in Tax Shelters, 54 SMU L. Rev. 47, 65 (2001). In contrast, in considering transactions attacked as mere tax shelters, the same article states that "this refined [substance over form] analysis is secondary. The court's analysis focuses first on the bona-fides of the transaction . . . [seeking] to determine whether they truly arose from business exigencies or [from] attempts to generate unreasonable tax benefits." Id. In other words, the court does not apply the substance over form analysis where the transaction is not bona fide; rather, if the transaction lacks economic reality, it is analyzed using the economic substance doctrine. These articles indicate both that there is a distinction between substance over form and economic substance and

that the district court was correct to characterize the government's position as a substance over form attack. See also Bankman, The Economic Substance Doctrine, 74 S. Cal. L. Rev. at 12 (the author's statement that a "[d]etailed discussion" of other common-law doctrines, including substance over form, is "beyond the scope" of an article on economic substance makes clear that there are distinctions between the two).

Additionally, we take note of a comprehensive analysis performed by the Department of the Treasury that delineates the difference between the substance over form and economic substance doctrines. See Dept. of the Treasury, The Problem of Corporate Tax Shelters: Discussion, Analysis and Legislative Proposals 46-58 (1999) (discussing the judicial responses available when addressing tax avoidance schemes) [hereinafter the "Treasury Department White Paper"]. The Treasury Department White Paper envisions the appropriateness of applying the substance over form doctrine in a case like the present one while reserving the economic substance analysis for situations where the economic realities of a transaction are insignificant in relation to the tax benefits of the transaction. [4]

---

[4] It states:

Generally, the tax results arising from a transaction (or series of transactions) are obvious, uncontroverted, and based on the "form"

(continued...)

Second, the doctrine of substance over form has been recognized in a number of our precedents.  For example, in  True v. United States  , 190 F.3d 1165 (10th Cir. 1999), we held that substance over form was a "fundamental tax principle," and applied it to "look beyond the taxpayers' characterization" of the challenged business transactions.    Id. at 1174 (citations and internal quotation marks omitted).  In  Kornfeld v. Commissioner  , 137 F.3d 1231 (10th Cir. 1998), we observed that "[t]he taxation scheme set out in the Internal Revenue Code is complicated and the tax consequences of many transactions depend on form, how the transaction is structured," but that at the same time, the "incidence of taxation

---

[4](...continued)
of the transactions the taxpayer has chosen.  In some rare (but important) cases, however, the "substance" of a particular transaction produces tax results that are inconsistent with its "form" as embodied in its underlying documentation . . . .   Under the substance-over-form doctrine, the IRS and the courts may recharacterize a transaction in accordance with its substance, if the substance of the transaction is demonstrably contrary to the form.

Treasury Department White Paper, at 46-47 (internal quotation marks and citations omitted).  It goes on to make clear that

[t]he third, and final, way the IRS can use non-statutory standards to challenge the tax benefits of a particular tax-advantaged transaction is through the application of the economic substance doctrine.  This doctrine allows the IRS to deny tax benefits if the economic substance of a transaction is insignificant relative to the tax benefits obtained.

Id. at 56.

-15-

depends on the substance of a transaction." Id. at 1234 (internal quotation marks omitted). And in United States v. Scott, 37 F.3d 1564 (10th Cir. 1994), we stated that "[t]he income tax consequences under the Internal Revenue Code depend upon the substance of the situation, not the form." Id. at 1572 (citing Diedrich v. Commissioner, 457 U.S. 191, 195 (1982)); see also Riley, 649 F.2d at 773 (10th Cir. 1981).

Third, we disagree that the cases cited by the taxpayers are sufficient to establish that this court has, as they put it, "recogniz[ed] no distinction between the substantive sham and substance over form doctrines," presumably for purposes of stare decisis. Aplts' Br. at 32. Bohrer's passing reference to substance over form can hardly be characterized as supporting the taxpayers' argument, much less as having sufficiently "articulate[d] a point of law" to mandate the respect of subsequent panels. See United States v. Meyers, 200 F.3d 715, 720 (10th Cir. 2000). Moreover, even if it had somehow abolished any distinction between the economic substance and substance over form doctrines, Bohrer would then conflict with earlier panel decisions applying substance over form (e.g., Riley), and earlier decisions prevail in the case of an intra-circuit conflict. See Haynes v. Williams, 88 F.3d 898, 900 n.4 (10th Cir. 1996). Bohrer therefore provides an insufficient foundation for the taxpayers' argument. And while James could support the taxpayers' position if one assumes there is no

-16-

difference between the doctrines of substance over form and economic substance, it more clearly fits neatly into the category of "tax shelter" cases described by the academic literature—in other words, those that apply the economic substance test when the transaction was entered into only to create a tax loss. James is thus as damaging to the taxpayers' argument as it is supportive. [5]

But perhaps the clearest discussion we have found elucidating the differences between these doctrines was not supplied by the parties in their briefs but by the district court in its order. Judge Lungstrum, during his discussion of the differences, references a number of cases and authors. See Rogers I , 58 F. Supp. 2d at 1240-1242. One of the cited authors, David P. Hariton, discusses the means by which the Commissioner—and, by extension, the courts—may challenge overly-mechanistic characterizations of tax related transactions. Mr. Hariton specifies three separate methods that may be used by the Commissioner to mete out equitable tax outcomes. They are: 1) applying subjective rules set out in the

---

[5] In its order, the district court explained: "Whether Mr. Fogelman had a subjective desire to structure the transaction as a loan would be an issue of material fact if the question before the court were whether the transaction was a sham. There was, certainly, on the summary judgment record, a clear business purpose for the notion of putting money into Mr. Fogelman's hands to satisfy his creditors and protect the baseball franchise. This was not a transaction entered into for 'the creation of income tax losses.'" Rogers I, 58 F. Supp. 2d at 1241 n.10 (quoting James, 899 F.2d at 909). This being true, James indicates that the economic substance analysis is inappropriate in the current context.

-17-

statutes and regulations; 2) re-characterizing the form of the transaction under the substance over form doctrine; and 3) applying the economic substance doctrine in cases where the economic or business purpose of a transaction is relatively insignificant in relation to the comparatively large tax benefits.    See David P. Hariton, Sorting Out the Tangle of Economic Substance, 52 Tax Law. 235, 238-39 (1999); see also Treasury Department White Paper at 46-58.  Speaking of the substance over form option, Mr. Hariton notes:

> The second way in which the Commissioner can challenge technical results is through a recharacterization of the form of the transaction. . . . Standards must govern the factual characterization of relationships and arrangements to some extent, and the Commissioner must have the ability to challenge the taxpayer's description of the relevant facts—otherwise the taxpayer's advantage would be insurmountable.

Hariton, Sorting Out the Tangle of Economic Substance, 52 Tax Law. at 238-39. By recharacterizing the way in which the taxpayer has designated the form of the transaction, the Commissioner and the courts are thus able to apply the appropriate objective rules to the transaction.

This method is distinct from the economic substance doctrine, and it is applicable here.  The transaction in question was not an attempted tax shelter entered into for the creation of tax losses, a mere sham devoid of economic substance.   Since the transaction clearly had real-world economic consequences, application of the economic substance doctrine is not appropriate.    Rather, this is a case in which the taxpayers seek to characterize a substantive transaction as one

-18-

thing rather than another and force the Commissioner—and this court—to accept the automatic consequences of the characterization. As Mr. Hariton's article points out, however, it is not up to the taxpayers to have the final say on how it is characterized.

We reminded the plaintiffs at oral argument of Abe Lincoln's riddle that has now become a dictum (in the non-legal sense of that word): "How many legs does a dog have if you call a tail a leg?" The answer is "four," because "calling a tail a leg does not make it one." This transaction—clearly not a sham—must be treated by the tax code under objective standards based on its form. Accordingly, and in light of the aforementioned reasoning, we hold that the district court correctly identified the substance over form doctrine as the legal standard governing the transaction's characterization for tax purposes.

### 3. Grant of Summary Judgment

#### a. Arguments of the Parties

The taxpayers further contend that the district court's grant of summary judgment was improper because a sufficient factual dispute remained with respect to the substance of the nonrecourse loan transaction.

They first suggest that the loan was valid because the debt was bona fide. The district court, they argue, found that both parties in this case "agreed that the

value of the collateral on the loan date exceeded the loan amount," which would normally indicate that the debt was legitimate. Aplts' Br. at 40. However, the court found that the debt was not in fact bona fide because of the nature of the option that Mr. Fogelman granted to the Royals at the time of the note (i.e., the KCRBC Option). See Rogers I, 58 F. Supp. 2d at 1242-43. The option reads in part as follows:

> Section 7.5    Exercise Price  . The aggregate purchase price (the "Purchase Price") for the Fogelman Interest subject to the KCRBC Option shall be an amount equal to the principal balance outstanding and all accrued, unpaid interest on the KCRBC Loan on the KCRBC Option Closing Date.

See Aplts' App. vol. IV, at 555. The district court stated:

> Setting aside for the moment the unlikeliness that Mr. Fogelman, an insolvent debtor, might have . . . miraculously come up with $34 million in five months to repay his "loan" to the Royals, there was a large and specific *disincentive*  for him to have done so . . . [U]nder the terms of these agreements, any money Mr. Fogelman would have paid on the alleged loan would have     *reduced*  the amount he received from the Royals on the option closing date. Not only did Mr. Fogelman have no economic incentive to pay the alleged loan, it would have been a financial disaster for him to have done so without first obtaining Mr. Kauffman's and the Royals' consent not to close on the option the Royals had exercised.

Rogers I, 58 F. Supp. 2d at 1242-43 (footnotes omitted) (emphases in original).

The taxpayers propose that this conclusion was incorrect, at least for the purposes of summary judgment, for several reasons. For instance, they state that "an equally reasonable construction of this pricing provision is that if Fogelman

-20-

paid the loan, then the Stockholders Agreement contained no price. Literally, for a price to exist, the loan must have existed with an 'outstanding' balance and 'accrued, unpaid interest.'" Aplts' Br. at 41. If Mr. Fogelman had paid the loan, they argue, the exercise price "would have been the reasonable value of the collateral or the option would have ceased." Id. at 41 (footnote omitted). In support of this proposition, they cite Koch Hydrocarbon Co. v. MDU Resources Group, Inc., 988 F.2d 1529 (8th Cir. 1993), and Northwest Cent. Pipeline Corp. v. JER Partnership, 943 F.2d 1219 (10th Cir. 1991).

With respect to the possibility of repayment, the taxpayers also state that "the parties contemplated" a possible payoff of the loan "when they agreed in Section 10.2 of the Stockholders Agreement that Fogelman could sell his stock to others if he paid the loan." Aplts' Br. at 41-42. [6] They propose that buyers would

---

[6] Section 10.2 of the "Stockholders Agreement" states, in pertinent part:

> Section 10.2   Transfers after Termination of Marketing Process. If the Marketing Process has been terminated prior to the KCRBC Sale, Fogelman agrees that he shall not sell . . . any shares of Common Stock . . . until the outstanding balance of the KCRBC Loan, including all interest accrued thereon, has been paid in full. After the KCRBC Loan has been paid in full, Fogelman may transfer his shares of the Common Stock or any interest therein to any Person; provided, however, that as a condition to such transfer, such Person shall execute an acknowledgment and agreement that such shares or interest are being transferred subject to the KCRBC Option.

Aplts' App. vol. IV, at 563.

not be interested in acquiring Mr. Fogelman's share of the team if the KCRBC Option would allow the team to reacquire that share for nothing once the loan had been paid.

The taxpayers then propose that "if Fogelman paid the loan and the Royals attempted to take his stock for nothing, Fogelman would not have allowed that to occur without a fight," because he desired to remain an owner of the team. Aplts' Br. at 42. In support, they cite several excerpts from the deposition of Mr. Jack Magids, an attorney who represented Mr. Fogelman during the negotiations of the agreement. Mr. Magids stated that Mr. Fogelman negotiated the option because he wanted to remain an owner of the team; in the taxpayers' view, this "makes no sense if the Royals could have taken Fogelman's stock for nothing after Fogelman paid the loan." Id.

Next, the taxpayers argue that the district court was incorrect in concluding, for the purpose of summary judgment, that ownership of Mr. Fogelman's interest had been transferred to the team. Under cases such as J.B.N. Telephone Co. v. United States, 638 F.2d 227 (10th Cir. 1981), they contend that Mr. Fogelman did not give up all the benefits and burdens of team ownership on July 31, 1990, indicating that the substance of the transaction was a loan, not a sale.

The taxpayers admit that the district court identified two ownership burdens given up by Mr. Fogelman on July 31, 1990: the obligation to make capital calls,

-22-

and any risk that the value of his interest in the Royals would fall below $34 million. They argue, however, that the obligation to make capital calls was not an inherent burden of corporate ownership, and that "because Mr. Fogelman desired to retain his Royals Interest," the possibility of losing that interest "was a huge risk for him." Aplts' Br. at 46.

They also dispute the other ownership benefits that the district court determined Mr. Fogelman had given up. As stated by the court, these were: the ability to exercise his option to purchase Mr. Kauffman's share of the team; his right to vote his shares of stock in the team; his right to be an officer and director and participate in the team's management; all his perquisites as an owner, including the right to attend baseball games at the Royals' stadium; the right to receive distributions of cash during the period the loan was outstanding; and the right to bid for the team during the auction process. The taxpayers state that Mr. Fogelman had already (in 1988) agreed that he would not exercise his option without Mr. Kauffman's consent; that he had already given a proxy to Mr. Kauffman (in 1988) to vote his stock and could not have reconfirmed a proxy if he did not own the stock; that an agreement not to seek office in the corporation does not indicate a transfer of ownership; that the same held true for the removal of Mr. Fogelman's perquisites; that Mr. Kauffman also had no rights to receive a

-23-

cash distribution; and that agreeing not to bid in the auction "reflects only an agreement," not a sale of Mr. Fogelman's interest. Aplts' Br. at 46-49.

The taxpayers note the district court also recognized that Mr. Fogelman *retained* two benefits of ownership through January 3, 1991: the right to receive a pass through of the team's net operating losses, and the right to receive "upside" rights in the auction, if any. The court stated, though, that Mr. Fogelman "had no power to retain these benefits beyond January 4, 1991 . . . because the Royals' option to purchase his stock was set to close on that date." Rogers I, 58 F. Supp. 2d at 1245. The taxpayers argue that "[a]n owner cannot logically continue to receive significant ownership benefits and, at the same time, transfer ownership before the benefits stop." Aplts' Br. at 50.

Finally, the taxpayers argue that a list of "sale indicia" from Leahy v. Commissioner, 87 T.C. 56, 66 (1986), demonstrates that there was no change in ownership and thus that the loan was bona fide. The taxpayers state: that legal title to Mr. Fogelman's interest did not pass until January of 1991, when he transferred it in lieu of foreclosure; that all the parties treated the transaction as a loan; that the Royals did not acquire an equity interest in Mr. Fogelman's property until January; that the team gained no control over the stock until January; that the team never accepted the risk of loss on the property; and that the team did not enjoy any benefits from Mr. Fogelman's interest until January.

-24-

The government disputes that any of these arguments demonstrate a genuine issue of material fact. With respect to the KCRBC Option, the government states that the taxpayers' position "is contrary to the plain wording of the option." It was not error, the government says, that the purchase price under the option would be nothing if Mr. Fogelman repaid the loan; instead, "it reflected the core agreement of the parties that the Royals would acquire Fogelman's stock for $34 million, whether he defaulted on his 'loan,' as was preordained, or whether the impossible happened and he repaid the 'loan.'" Aple's Br. at 37. The government also states that "[i]f the parties had contemplated that the option would terminate if the 'loan' were fully repaid, the termination clause would have so stated. The absence of any such provision confirms that a zero balance equaled a zero purchase price." Id. at 38. And, according to the government, the fact that the Royals exercised their option in July of 1990, at the very time the agreement was made—although closing of the option was deferred until at least January 4, 1991—shows that there was no intent to wait for the possible repayment of the loan and that "the parties believed and understood that Fogelman's ownership in the Royals was ended" as of July, 1990. Aple's Br. at 39; see also Aplts' App. vol. IV, at 687 (Notice of exercise of the KCRBC Option by the Royals on July 31, 1990).

-25-

The government then challenges the taxpayers' position on the burdens and benefits of ownership. It argues that the taxpayers "identify no burdens that [Mr. Fogelman] retained," and that prior to the Stockholders Agreement of July 31, 1990, he was in fact obliged either to contribute capital to the team when called upon to do so, or to forfeit "a commensurate amount of his stock." Aple's Br. at 40-41. The government also points out that many of the parties with an interest in the outcome of the transaction were concerned about Mr. Fogelman's possible authority to exercise his option to purchase Mr. Kauffman's share or to vote his shares. Thus, the government argues, Mr. Fogelman's subsequent relinquishment of this authority in the agreement supports the district court's conclusion that Mr. Fogelman was relinquishing ownership at the time of the transaction. The government concludes that the district court was correct to find that the transaction was, in substance, a sale.

### b. Analysis

In <u>True</u>, we held that:

Cases involving the issue of substance over form require resolution of significant questions of fact. Nevertheless, the mere presence of a factual question does not automatically preclude summary judgment. Even in cases where some issues of fact remain, if no reasonable fact-finder could find in favor of the non-moving party, then summary judgment is still appropriate.

190 F.3d at 1176 (footnote omitted). It has been suggested that in the present case, the factual analysis is complicated by the contested nature of the underlying contract (i.e., the Stockholders Agreement), precluding summary judgment. As the district court observed, however, "[i]n the field of taxation, administrators of the law and the courts are concerned with the substance and realities [of a transaction], and formal written documents are not rigidly binding . . ." Rogers I, 58 F. Supp. 2d at 1240 (quoting Frank Lyon Co., 435 U.S. at 573). How the agreement in question is to be construed "depends not upon any particular phraseology used in the document[] but rather upon what the parties actually did, gleaned from a consideration of the written instrument[] . . . and the surrounding circumstances . . . . [And] in the light of the record as a whole . . ." Estate of Franklin v. Commissioner, 64 T.C. 752, 763 (1975), *aff'd on other grounds by* Franklin's Estate v. Commissioner, 544 F.2d 1045 (9th Cir. 1976). Thus, this panel must look at the circumstances surrounding the transaction in question to determine whether any reasonable fact-finder could find in favor of the non-moving party. If not, then summary judgment in favor of the government was appropriate.

As explained above, the taxpayers forward six main arguments in support of their view that the debt was bona fide and therefore that they should be allowed to claim the bad debt deduction. These arguments, which we will address

in order, are: 1) that the value of the collateral in relation to the amount given to Mr. Fogelman indicates that the transaction was in reality a loan; 2) that the provisions in Section 7.5 of the agreement meant that there was "no price" if Mr. Fogelman repaid his loan, thus contradicting some of the district court's reasoning; 3) that Section 10.2 of the agreement anticipated the actual repayment of the loan by Mr. Fogelman, further undercutting the district court's reasoning; 4) that Mr. Fogelman expressed his desire to retain ownership in spite of his mounting economic troubles, suggesting he would not have sold his share of the team; 5) that an analysis of the burdens and benefits of ownership suggest that Mr. Fogelman was still the owner of his share; and 6) that the "sale indicia" suggest the transaction was a loan. After carefully reviewing the parties' positions, we hold that the district court correctly concluded that this transaction was in substance a redemption of Mr. Fogelman's stock and not a loan to Mr. Fogelman. As the district court observed, the most obvious support for this position derives from the incentives that the KCRBC Option gave to the parties involved. However, it is a full analysis of the context of the transaction that convinces us that no reasonable fact-finder could support the taxpayers' view.

i. the value of the collateral

With respect to the taxpayers' first point, we agree with the district court's reasoning that the value of the collateral at the time of the purported loan is

hardly dispositive.  The nature of the arrangement—and specifically the interaction of Sections 7.5 and 10.2, as discussed next—eclipse any support provided by the taxpayers' first point, even on a motion for summary judgment. The taxpayers acknowledge that the purpose in looking at the value of the collateral is whether there was incentive for the borrowing party to repay the note. See Aplts' Br. at 40.  However, as discussed below, the incentives were clearly against repayment of the note, and thus a consideration of the value of the collateral is of little help to the taxpayers' position.  Indeed, the very case relied upon by the taxpayers for this point, Saviano v. Commissioner, 765 F.2d 643 (7th Cir. 1985), states that "'in a true lending transaction, there exists the *reasonable likelihood that the lender will be repaid in the light of all reasonably foreseeable risks*.'" Id. at 646 (quoting Gibson Products Co. v. United States, 637 F.2d 1041, 1047 (5th Cir.1981)) (emphasis added).  As discussed below, there was apparently no likelihood of any such repayment—thus, Saviano's reasoning suggests that the value of the collateral is relatively inconsequential in proving the transaction was a loan.

ii. Section 7.5 of the Stockholders Agreement

As for the taxpayers' second argument—that the agreement contained "no price" upon repayment and thus the district court misconstrued it—we must begin with an analysis of the content of the agreement.  Although the parties did not

brief the issue of which state's law was to apply, and the district court did not explicitly mention it, the Stockholders Agreement specifies that it is to be construed in accordance with Missouri law. See Aplts' App. vol. IV, at 567-68 (Section 12.7 of the Stockholders Agreement). Under Missouri law, "[t]he primary rule in the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention." Speedie Food Mart, Inc. v. Taylor, 809 S.W.2d 126, 129 (Mo. Ct. App. 1991). A contract that "is clear and unambiguous on its face is not open to judicial construction"; the "initial question to be determined" is thus "whether an ambiguity exists." Id. Regardless of the taxpayers' hypothetical assertions as to what might have happened had Mr. Fogelman paid the loan, the KCRBC Option unambiguously states that its exercise price is to be equal to the balance of the loan remaining to be paid. [7]

_____

[7] As previously mentioned, the taxpayers cite Koch Hydrocarbon Inc. and Northwest Cent. Pipeline Corp. in support of their proposition that a "reasonable price" should be imposed as the exercise price of the KCRBC Option in lieu of the Section 7.5 exercise price upon full repayment of the $34 million. The taxpayers provide no explanation of how these cases support their view and include no pinpoint cites to these cases. These cases state that when a price provision in a contract is ambiguous, parol evidence should be considered in determining the parties' intent with respect to the price. See Northwest Cent. Pipeline Corp., 943 F.2d at 1227. Only when the court determines that the intent of the parties cannot be ascertained from parol evidence, however, is a "reasonable price" provided by the court. See Koch Hydrocarbon Co., 988 F.2d at 1535. Since we find the provisions to be unambiguous, neither of these cases applies and the taxpayers are incorrect in asserting that they impose a "reasonable price."

Where the language of the contract is clear, it is sufficient evidence of the intent of the parties. <u>Tuttle v. Muenks</u>, 21 S.W.3d 6, 9 (Mo. Ct. App. 2000). We therefore have no need to consider parol or extrinsic evidence, such as the taxpayers' claims about what Mr. Fogelman might have done had the Royals attempted to take his interest for nothing. [8]

iii. Section 10.2 of the Stockholders Agreement

As a third general argument, the taxpayers emphatically point to the possibility that Mr. Fogelman could sell his stock to others upon repayment of the loan—as stated by Section 10.2 of the Stockholders Agreement—as an indication that the purpose of the transaction is at least debatable and therefore that

---

[8] Nevertheless, we reject the taxpayers' argument that Section 7.5 implies that if Mr. Fogelman had repaid the purported loan that the amount the Royals would have to pay Mr. Fogelman for his interest under the KCRBC Option would be "no price," meaning that the option would have terminated. See Aplts' Br. at 41. Not only does this interpretation conflict with the plain language of the agreement, but the government rightly points out that the parties would (or should) have included language in the termination clause of the agreement had they intended any such construction. But the clearest manner in which the taxpayers' argument on this point is shown to be without merit is the fact that the terms of Section 10.2 explicitly contemplate the existence of the KCRBC Option *after* full repayment of the $34 million: "*After the KCRBC Loan has been paid in full, Fogelman may transfer his shares . . .* to any Person [] provided [] that as a condition to such transfer, such Person shall execute an acknowledgment and agreement that such shares or interest are being transferred *subject to the KCRBC Option*." Aplts' App. vol. IV, at 563 (emphasis added). Since the terms of Section 10.2 make it clear that the KCRBC Option still existed in the eventuality of full repayment, the taxpayers' argument that the option extinguished on repayment is simply wrong.

-31-

summary judgment is inappropriate. We disagree. As already mentioned, the taxpayers assert that no buyer would be interested in purchasing Mr. Fogelman's share of the Royals if the KCRBC Option would allow the team to acquire that share for nothing (as the district court's determination would require). Thus, they argue, Section 10.2 would be rendered meaningless or nonsensical.

It appears from the nature of the transaction, however, that this kind of disincentive to potential outsider buyers is precisely what the parties to the agreement intended. To begin with, the taxpayers seem to acknowledge that partial repayment would have reduced the price of exercising the KCRBC Option. For example, if Mr. Fogelman had repaid $20 million, the unambiguously-defined exercise price of the KCRBC Option would have been $14 million (plus interest). Thus, any partial repayment by Mr. Fogelman would decrease the amount he would receive once the Royals closed on the KCRBC Option. The taxpayers provide no argument refuting this very real disincentive to repayment. Further, it was in the parties' interest to find ways to discourage potential buyers from interfering with the complex arrangement they had devised for the sale of Mr. Fogelman's share in the Royals. At a minimum, the provisions of Section 10.2, viewed in light of the entire transaction, do not support the taxpayers' objections. To the contrary, this arrangement reinforces the idea that no reasonable fact-finder could rule in favor of the non-moving party on summary judgment.

That the parties envisioned a sale or redemption of the stock is further shown by the Royals' decision on the day the agreement was finalized to exercise the option to purchase Mr. Fogelman's interest. See Aplts' App. vol. IV, at 687. Indeed, apparently all parties contemplated this specific action *before* the Agreement was finalized. See id. at 577 (Resolution of the Royals' Board of Directors, dated July 13, 1990, directing the Royals to exercise the KCRBC Option contemporaneously with the finalization of the Stockholders Agreement). The exercise of the KCRBC Option would presumably preclude an attempt by Mr. Fogelman to repay the "loan"; the exercise of it on the day the "loan" was made suggests the transaction was never intended to be anything other than a sale of Mr. Fogelman's interest. [9]

The taxpayers suggest that the Royals could not have invoked this option to acquire Mr. Fogelman's interest if Mr. Fogelman had repaid the purported loan. In their view, this construction of the option supports their characterization of the transaction as a loan. To the contrary, however, the evidence reveals two critical facts. First, the possibility of Mr. Fogelman repaying the loan was never taken seriously. Mr. Magids, Mr. Fogelman's attorney during negotiation of the

_____

[9] The taxpayers have given no other explanation for why the option was exercised at the same time the agreement was finalized. The only reason we can imagine is the one offered by the government: that the exercise of the KCRBC Option was specifically used as a disincentive for repayment, thus supporting the characterization of the transaction as a sale.

-33-

agreement, testified that:

> It was *quite clear* that, based upon the totality of all the agreements, that Mr. Fogelman's continued interest in the Royals would come to an end some time in early January 1991 in the absence of the parties reaching agreements to modify the documents that were signed in July of 1990.

See Aplts' App. vol. VIII, at 1884 (emphasis added). Other evidence in the record reinforces this view. [10] Indeed, in the words of the government, "[i]f the parties had intended that the [Royals' option to acquire Mr. Fogelman's interest] could not be exercised if the 'loan' was fully repaid, the exercise date of the option would [have to have] been deferred until the note came due to allow for that possibility." Aple's Supl. Br. at 9. Second, as previously mentioned, the terms of Section 10.2 of the agreement explicitly contemplate the Royals' exercise of the KCRBC Option upon full repayment of the loan. Thus, the taxpayers' argument on this point is totally without support.

With regard to the transaction's substance, as the district court found, there was clearly no incentive for either Mr. Fogelman or Mr. Kauffman to take any additional actions once the Stockholders Agreement had been reached. If Mr. Fogelman had repaid the loan, with interest, the Royals would have been able to

---

[10] For example, the deposition of Michael Lobdell, a representative of J.P. Morgan & Co., reveals that at the time of the structuring of the auction there was no discussion of the possibility that Mr. Fogelman would repay the loan and there was an understanding that Mr. Fogelman lacked the resources to do so. See Aplts' App. vol. IX, at 1995-96.

acquire his share of the team for nothing. Mr. Fogelman thus had no reason to make any payments. [11] Knowing this, the Royals had only to wait for the due date of the nonrecourse note, and the corresponding default—made inevitable *both* by Mr. Fogelman's financial situation and by the contractual language—in order to gain control of Mr. Fogelman's share of the team. In addition, if the Royals had wanted to exercise the option before the note's due date, and Mr. Fogelman had not then made any payments, the option exercise price would have been $34 million. Mr. Fogelman presumably could not keep that money, though, because he would have had to retire the note on the property he was now "selling" in order to provide "good and marketable title" as required by Section 7.4 of the agreement, thus resulting in the exact same consequence: Mr. Kauffman owning Mr. Fogelman's share of the team and Mr. Fogelman with $34 million as payment for his share.

iv. Mr. Fogelman's ownership desire

The taxpayers' fourth assertion—that Mr. Fogelman's subjective desire to retain ownership of his share of the team indicates that the transaction was a loan and not a redemption—is of little relevance in light of the overwhelming evidence that the agreement provided profound disincentives to repayment. This argument

---

[11] And, as noted, any partial repayment of the loan would have resulted in Mr. Fogelman walking away with only part of the $34 million loan amount under the unambiguous price terms of the KCRBC Option.

-35-

is further undercut by the apparently universal view—shared even by Mr. Fogelman's own attorney [12]—that Mr. Fogelman would have been unable to find the money necessary to repay the amount of the purported loan. While Mr. Fogelman may not have wanted to give up his share of the Royals, the fact that he owed nearly $1 billion to his creditors makes his desire irrelevant to this transaction. No reasonable fact-finder could believe that Mr. Fogelman's wishes on this subject were sufficient to indicate that the transaction was a loan.

v. the burdens and benefits of ownership

The taxpayers' fifth point is also of little help to their appeal. As discussed above, the taxpayers point to the ownership benefits retained by Mr. Fogelman during the interim period between the signing of the agreement and the closing of the KCRBC Option as evidence of the fact that the transaction was a loan and not a sale. However, t he district court described these rights as "not at all inconsistent with a sale," as "it is not uncommon for [a] seller to retain certain benefits of ownership" between the date a contract of sale is signed and the date it is closed. Rogers I , 58 F. Supp. 2d at 1245 n.16. We agree with the district court's reasoning on this issue.

vi. sale indicia

The taxpayers' sixth general assertion also does not support a reversal of

---

[12] See Aplts' App. vol. VIII, at 1871.

the district court's order.  They argue that the list of sale indicia from         Leahy

supports the characterization of the transaction as a loan.  While some of the

indicia from  Leahy might support viewing the transaction as a loan in another

context, the point in the cited section of that case is that the characterization of a

transaction as a sale is to be determined by looking at the written agreement in

light of the surrounding circumstances.     See Leahy , 87 T.C. at 66.  As already

discussed, the attendant circumstances overwhelmingly show that the transaction

in question was not a loan.   [13]

The analysis above reveals the parties' understanding about the

"loan"—namely, that the transaction was in substance a sale, regardless of the

form in which the parties happened to cloak it.  We find it particularly telling that

the parties contemplated a direct sale of the team when drafting the agreement

and that, apparently, the only two hurdles for drafting the transaction as a sale

were 1) Mr. Fogelman's fondness for the team and 2) the negative tax

---

[13] Before concluding this analysis, we take note of the fact that the taxpayers paid a statutory loan fee to the state of Tennessee at the time of the transaction, although the taxpayers do not emphasize this fact on appeal. According to the district court, the fee amounted to 0.115 percent of the $34 million, or approximately $39,000.     See Rogers I , 58 F. Supp. 2d at 1241.  We agree with the district court's conclusion that this relatively "paltry" amount is "not a material consideration."     Id.  Based on the totality of the evidence relating to the transaction, this fee appears to have been an attempt to inexpensively cloak the substance of the transaction with the form of a loan.

-37-

consequences to the creditors of a direct sale.    See Aplts' App. vol VIII, at 1803

(deposition testimony of Mr. Magids, dated Feb. 20, 1999).  As Mr. Magids stated

> I think . . . toward the end of the process [of negotiating the agreement,] when it became more evident that the benefits of the loan as originally conceptualized[—] includ[ing] Mr. Fogelman's being able to both take care of his creditors and keep the Royals[—]were fading, [] we revisited the idea of a sale internally, quite frankly, and with the creditors.  They were interested in it, but there was no way that the thing could work with a sale, as I recall . . . [b]ecause . . . the 1990 taxes would have taken cash out of the pot.

Id. at 1803-04.  While the parties may have found an alternative form to avoid

paying these taxes, the substance of the transaction was that of a sale of Mr.

Fogelman's interest in the Royals.  No reasonable fact-finder would be swayed by

the assertion that a man owing nearly $1 billion to his creditors—who borrowed

$34 million secured by his interest in a baseball team and who granted an option

eliminating his ownership rights in the team—nevertheless had the subjective

desire to retain his share of that team.

As stated by the district court:

> The transaction gave Mr. Fogelman no incentive or obligation to repay his purported debt . . . and he parted with all of the burdens, and all but two of the benefits[,] of his Royals interest on the date the "loan" closed.  Moreover, he had no way to continue to retain even those two benefits beyond January 4, 1991 and had absolutely no *right* to retain his Royals interest simply by paying off his purported debt in light of the option he granted to [the Royals] as an integral part of the transaction.  This is the stuff of substance.  Legally, it overwhelms the nominal form of the transaction, in which the parties paid a minimal loan tax . . . [and] overwhelms any evanescent desire Mr. Fogelman may have had to perpetuate his dream of Royals

-38-

> ownership by having the transaction structured as a loan. Mr. Fogelman agreed on July 31, 1990 to a transaction that gave him no right to retain any ownership in the Royals even if he paid off his "loan."

Rogers I, 58 F. Supp. 2d at 1245 (emphasis in original). The conclusion of the district court comports with our analysis.

The substance over form tax doctrine allows the court to ensure that "business transactions do not permit some taxpayers to avoid tax at the expense of others in a way that was not intended by the political system." Hariton, Sorting Out the Tangle of Economic Substance, 52 Tax Law. at 236. We agree with the district court's conclusion that "the economic realities of the transaction, *even granting the plaintiffs all the factual inferences to which they are entitled*, overwhelmingly dictate the legal conclusion that a sale, or more properly, a redemption of Mr. Fogelman's Royals stock, and not a loan, took place." Rogers I, 58 F. Supp. 2d at 1241 (emphasis added). The analysis above shows that the transaction was properly recharacterized as a sale for tax purposes. See, e.g., Twenty Mile Joint Venture, PND, Ltd. v. Commissioner, 200 F.3d 1268, 1278 (10th Cir. 1999) (substance prevailed over form where form did not reflect the "reality of the situation"). Because we conclude that "no reasonable fact-finder could find in favor of the non-moving party" that the transaction was not in substance a sale, summary judgment was appropriate. See True, 190 F.3d at

1176. We therefore affirm the district court's order on summary judgment regarding characterizing this transaction as a redemption.

## B. Equitable Recoupment

Upon the district court's finding that the transaction in question was a redemption rather than a loan, the taxpayers filed a motion for judgment in their favor on the issue of whether they were entitled to a tax refund since they had treated the transaction as a loan for tax purposes in 1990, 1991, and 1993. In particular, the taxpayers pointed out two things. First, the Royals had claimed interest from the "loan" as income, passing through the income interest to the taxpayers. Thus, the taxpayers paid taxes on this income (the "Interest Overpayment"). [14] Second, the Royals had allocated 50% of the Royals net operating losses for 1990 to Mr. Fogelman, allegedly based on the assumption that he was a 50% shareholder at the time, thus precluding the taxpayers from claiming for themselves the tax benefits of those losses (the "Partial Operating Loss Allocation").

---

[14] The taxpayers do not state any amount of interest that was actually paid by Mr. Fogelman during the course of this transaction. Rather, it appears that they "recognized interest income" on paper for tax purposes and then later claimed the loss of that interest income as a bad debt. Rogers II, 76 F. Supp. 2d at 1162.

The taxpayers asserted to the district court that since the transaction was deemed a redemption, they were being unfairly taxed on the amount of the Interest Overpayment. In other words, the government was receiving tax payments from the taxpayers by treating the transaction both as a loan (with taxes assessed on the interest income from the "loan") and as a redemption (by prohibiting the taxpayers from claiming the benefit of a bad debt deduction). The taxpayers objected to the negative tax consequences to them from these inconsistent characterizations of the transaction.

Similarly, the taxpayers asserted that the Partial Operating Loss Allocation was assigned to Mr. Fogelman solely based on the assumption that he was a 50% owner of the team at the time. Since the district court found that Mr. Fogelman had sold his interest, the taxpayers complained that they should have been able to claim the Partial Operating Loss Allocation for themselves. In essence, they claimed that the government was penalizing them by preventing them from claiming the bad debt deduction stemming from the default of the "loan" while also asserting an inconsistent position that the taxpayers could not claim the amount of the Partial Operating Loss Allocation. Hence, the taxpayers requested a tax refund on summary judgment for both "overpayments."

The district court determined that, in general, the taxpayers' refund request was barred by the statute of limitations contained in Section 6511(a) of the I.R.C.

See 26 U.S.C. § 6511(a). However, the court also found that the doctrine of equitable recoupment allowed the taxpayers to recover some of the requested amount from the I.R.S. See Rogers II , 76 F. Supp. 2d at 1169-71. Specifically, the district court allowed the taxpayers a refund for the Interest Overpayment but determined that the doctrine of equitable recoupment did not allow them a refund for the Partial Operating Loss Allocation. See id. at 1173.

In light of our finding that the transaction is properly characterized as a sale or redemption, the taxpayers appeal the portion of the district court's order that denied them a refund for the Partial Operating Loss Allocation. [15] Since the district court made the ruling as a matter of law during summary judgment, this court reviews that specific judgment *de novo* . See Goatcher v. United States , 944 F.2d 747, 749 (10th Cir. 1991).

The doctrine of equitable recoupment was first articulated in Bull v. United States , 295 U.S. 247 (1935). Bull states that when the government uses inconsistent theories to obtain more money than it is fairly entitled to when examining a single transaction for tax purposes, a refund may be allowed in spite of the expiration of the statute of limitations. See id. at 260-61, 263; see also

---

[15] On appeal, the taxpayers only challenge the district court's refusal to apply the doctrine of equitable recoupment to the Partial Operating Loss Allocation, and so this court need not address the district court's findings with respect to the statute of limitations and mitigation statutes contained in the Internal Revenue Code.

United States v. Dalm, 494 U.S. 596, 608 (1990) ("[A] party litigating a tax claim in a timely proceeding may, in that proceeding, seek recoupment of a related, and inconsistent, but now time-barred tax claim relating to the same transaction."). It is evident from Supreme Court precedent, however, that recovery using the doctrine of equitable recoupment is restricted to situations where a "single transaction or taxable event ha[s] been subjected to two taxes *on inconsistent legal theories* . . ." Rothensies v. Electric Storage Battery Co., 329 U.S. 296, 300 (1946) (emphasis added). Indeed, "the same sum may in different aspects be used for the computation of [two separate taxes that are not inconsistent.]" Bull, 295 U.S. at 256. In other words, if the multiple bases for a tax assessment are not inconsistent, then there is no occasion to apply equitable recoupment.

As the district court keenly observed of the transaction between Mr. Fogelman and the taxpayers:

> There were actual operating losses which arose not because of the characterization of the transaction but from conducting the business. The parties to the contract agreed to allow Mr. Fogelman to claim 50% of the deductions related to those net operating losses, which he did until January 3, 1991. The IRS had no part in this allocation agreement between private parties and has not asserted a deficiency against Mr. Fogelman related to the deductions. Preserving that allocation is not inconsistent with treating the transaction as a redemption. Rather, the parties allowing Mr. Fogelman to take the deductions is properly viewed either as part of the consideration for the sale of Mr. Fogelman's Royals stock or as a reflection of the parties' intentions concerning who would enjoy certain fruits of ownership until the date on which the sale would "close."

Rogers II, 76 F. Supp. 2d at 1170.  We agree with the reasoning of the district court on this issue.  The taxpayers and Mr. Fogelman presumably decided to assign the Partial Operating Loss Allocation to Mr. Fogelman for specific reasons that do not contradict the tax characterization of the transaction as a redemption.  Therefore, the taxpayers cannot claim that the government is attempting to impose upon them tax consequences for the Partial Operating Loss Allocation in a manner that is inconsistent with the redemption.

Additionally, we note that cases applying this doctrine strongly suggest that "if the subject transaction involves two or more taxpayers, equitable recoupment will not be available unless a sufficient identity of interests exists so that the taxpayers should, in equity, be treated as a 'single taxpayer'." Parker v. United States, 110 F.3d 678, 683 (9th Cir. 1997) (quoting Stone v. White, 301 U.S. 532, 537-38 (1937)); see also Estate of Vitt v. United States, 706 F.2d 871, 875 n.3 (8th Cir. 1983) ("Absence of an identity of interest may result in the denial of recoupment.").  Such an identity of interests is not present here.  Further, if we were to grant the taxpayers' request, there is "a tax [that] should be paid, [but if the taxpayers] are permitted to recover no one will pay it." Stone, 301 U.S. at 537.  The equitable concerns articulated in Stone further militate against application of equitable recoupment in favor of the taxpayers in the present case.

-44-

Since there is no inconsistent tax treatment, and since equitable concerns suggest that the doctrine should not be applied in situations involving two unrelated taxpayers, there is no occasion to apply the doctrine of equitable recoupment to the Partial Operating Loss Allocation. We thus affirm the district court's order on this issue.

## C. Admissibility of the Expert Report

The government submitted with the district court the deposition testimony and report of Andrew Zimbalist, an expert who offered a valuation of the Royals on July 31, 1990. His testimony was relevant since the bad debt loss claimed by the Royals was dependent on the proper valuation of the team at the time the "loan" was made. The taxpayers filed a motion to strike the report and to exclude Mr. Zimbalist's testimony. The district court subsequently denied the taxpayers' motion, and they appealed that decision.

The use of Mr. Zimbalist's testimony was solely for the purpose of valuing the Royals on the date of the purported loan. Because we hold that the transaction was a sale and not a loan, the value of the team at the time of the

transaction is inconsequential to our decision.  Thus, Mr. Zimbalist's testimony is not relevant, and this issue need not be addressed.    [16]

## III.  CONCLUSION

For the foregoing reasons, the summary judgment orders of the United States District Court for the District of Kansas are AFFIRMED.

---

[16] We note, however, that if we were to address the issue, the taxpayers have not satisfied their burden of showing that the district court abused its discretion in admitting the expert testimony of Mr. Zimbalist.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999) (applying abuse of discretion standard in evaluating the district court's expert testimony decisions).